And we will move to the last case on calendar, which is United States v. Gonzalez-Quintana. Good morning, Your Honors. Steven Barth with Federal Defenders. May it please the Court. I'd first like to address, Your Honors, the Fourth Amendment issue, the unlawful stop that Mr. Gonzalez appeals. Taking the totality of the circumstances here, Your Honors, what we have is the Border Patrol saw a car come to a lawful stop at a stop sign. A car was heading north from the communities of Campo and Moreno, an area of residential and commercial activity. It was heading in the same direction that hundreds of cars head every time, every day, at that time of the day in the morning. As Agent Roberts said, this is the time of day when most people are heading to work. The car took a left onto Old Highway 80. It was not driving erratically. The report on its tags were that it was lawfully registered, not a stolen vehicle, and it was obeying the speed limit. Your Honors, we have here... At or below the speed limit? The testimony of Agent Chapa was that it was driving below the speed limit. Did he say how much? I'm sorry? How much below? He said it was driving... No, he didn't say how much. He said it was driving very slowly. Very slowly. Those were his words. Yeah, that's what I thought. Very slowly. He also said it was riding low. Both Agent Roberts and Agent Chapa did say the car was riding low. So yes, the District Court made some findings that included that they saw that the car was riding low and that it was driving slowly. Let me address those first. The fact that it was riding low. What Agent Roberts told the District Court was essentially, I only saw two people in this car. It was riding low, so what that says to me is there's unexplained cargo hidden somewhere in it. However, as I point out in my reply brief, his testimony changed at trial. I questioned him about it during the trial. I said, how many drivers did you see? And he said, actually, I could only see the shadow of the front seat passenger. And the reason he could only see the shadow of the front seat passenger was because he said the windows were tinted. Okay? He did not see two passengers. He only saw one. Interesting question. I've had this argument before. We have to look at the record of the suppression hearing, and you want to talk to us about additional impeachment evidence that you say you reduced at the trial. I don't think we can do that unless you've got a case that says we can. I do believe you can do that. What's your best authority for that? I certainly will file a 28-general. I don't want another letter. I mean, can you tell me a case that you cited in your briefs? You guys have already buried us with enough pleadings in this case to build a bonfire. So have you got a case or not? I don't have a case. All right. Then let's confine ourselves to the record of the suppression hearing. And I'd like you to address the other factors that you have not discussed, which is that the district court also turned to the fact that this permanent checkpoint was located in the area that the officers had testified based upon the fact that a permanent checkpoint was nearby, that this was a route that was sometimes used by smugglers to avoid having to go through the permanent checkpoint. Don't we look at that, too? Well, addressing that directly, Your Honor, one, what the testimony, as I recall, came out. I believe this is in page 70 of the excerpt, 70, 72 of the excerpt, was that he began to testify that smugglers liked to use that route because it avoids a checkpoint. First, I objected on the grounds that it was speculative, and the court sustained that objection. Secondly. Well, wait a second. I'm looking at ER 155 where the judge says in his findings of fact at the suppression hearing that the officers testified that in their experiences smugglers tried to avoid the permanent checkpoint by going Highway 80. Yes, it's true, but you did sustain my objection. However, to answer your question, I asked Agent Chapa, I believe, Agent Roberts or Agent Chapa, during the suppression hearing, is it often that you set up a checkpoint, a temporary checkpoint on Old Highway 80? And he said, yes, we often do that. Sometimes we do it very regularly. And they're very well aware of the fact that there's a temporary, that Border Patrol is aware that there's a temporary checkpoint there. So it makes sense that they would regularly have it. Isn't there a permanent Border Patrol checkpoint in the area? There's a permanent Border Patrol checkpoint on Interstate 8. Okay. And the testimony by the agents, as I read the record, was that smugglers sometimes try to evade that permanent checkpoint by taking this alternate route. So in order to interdict the smuggling, they set up from time to time temporary checkpoints. Yes. Okay. That's correct. All right. Go ahead. Your theory is that smugglers know that both routes are covered, one maybe less frequently. Of course. And that's why I asked him that question. Is this irregular that you do this? No. He said, we often do it. I think he said, sometimes it's very regular, sometimes it's not. But both the Border Patrol knows that this route could be used because there's a temporary checkpoint on I-8, but not one on Old Highway 80. But I'm sure that the smugglers are aware of the same thing. And that's why they – Not all of them are aware of it because these agents testified to, what, almost 100 arrests for smuggling in the vicinity? Yes. So apparently the word's not getting out to everybody. Well, let me – I can address that point as well, Your Honor. That goes to the idea that this is a notorious area for stopping smugglers. Now, Agent – I believe it was Agent Roberts said there had been 50 or 60 arrests that he had made in that area. But however I did the math, for Your Honors, he'd been a Border Patrol agent for 17 years working this area. And when you break that down, that's about three arrests, four arrests per – actually, less than three arrests per year. The same goes for Agent Chapa. I think he had a higher rate of arrests per year. It was more like, I think, 10 arrests per year. Compare this to other cases. I know Judge Kaczynski cited a case in which – I believe this was in the Montero Camargo case – in which there are 2,500 arrests over, you know, a five-block area in a short period of about a month or two months. And that's in my papers. Now, that's a notorious area for drug dealing or smuggling. What we had here was the agent testified, this general area is notorious. And the judge questioned him about this. What do you mean by a general area? And he said, well, that corridor of Interstate 8 and Old Highway 80. Well, Interstate 8 is a huge corridor. I mean, it's a major area that runs east to west from this area into San Diego. In fact, it runs all the way to the Pacific Coast. And it basically parallels the border of Mexico. So we really don't know what area these 50 or 60 arrests by Agent Roberts took place. Moreover, really over almost two decades of work, that isn't a whole lot of arrests in this area. Just some of the other points that the government raised. It insinuates that this was an arrest that took place at an unusual time of the morning, very quickly. It was 545 in the morning. Agent Roberts testified, this is when people usually go to work. And as my investigator testified, just under 200 cars per day approached that stop sign south heading north between the hours of 5 in the morning to 6.30 in the morning. Well, I'm not sure what to make of that fact, though, because the district judge did say at 1.53 of the excerpts of record that he accepted the testimony from your investigator with regard to the fact that the sun rose at 6.29 that morning and that these events occurred around 5.45 a.m. But it appears to me that what he's saying there is that, well, he says, I draw a reasonable inference it wasn't dark, the sun wasn't up, but I believe there's no information that's been presented to me that the officers couldn't see or that the darkness prevented them from making clear observations. I certainly can address that as well. That's not inconsistent with being a normal work time for people to be commuting to work. That's what I was arguing. Okay. All right. So he's saying, well, it wasn't so dark that they couldn't see, and your point is it was light enough and at about the time of the day when people are going to work generally. Actually, my point is simply that it really was an unusual time to see traffic on this road. Okay. Moreover, there's some insinuation, and I know the record is the government's argument is somewhat garbled because it used some arguments from a different case on accident. But there is some insinuation in its brief that this occurred during shift change, and it simply did not. The record is very clear that shift change occurs at 7 a.m. They saw the car at 5.45 a.m., not even close, an hour and 15 minutes between the two. With regard, going back to the point I think you were making, though, Judge Tallman, which is what time of the morning was this? Was it dark out? Was it not? It was 5.45 in the morning. The evidence was that the sun rised at about 6.29. There also was evidence from Agent Chapa that there were no lights in this area, in OH80 and Buckman Springs Road. I do find it, going back to the unexplained cargo or the riding low, this was a Ford Explorer. There were eight passengers, I believe, in the Ford Explorer. This is a vehicle that's supposed to be able to house that many people, plus cargo in the back. Was it riding so low that it became noticeable because of these eight folks in the SUV? And if so, if it was riding low and in two inches, would it have been visible at that time of the morning by Agent Roberts, a person who couldn't, when the car passed him, even see anything but a shadow of those passengers? Well, we've got to express factual finding by the district court, though, that it was light enough to see. Well, I don't know that she said it was light enough to see. I think what she said was, I can't find that it was completely dark out. She said that I believe there's no information that's been presented to me that the officers couldn't see or that the darkness prevented them from making clear observations. And now you seem to be arguing directly contradictory to the district court's factual finding. Well, I think what I'm arguing, Your Honor, is because it was that time of the morning, because it was 45 minutes before the sun rises, one can question how visible it was. And, I mean, maybe there's no evidence. Maybe the district court found that there was absolutely no evidence, but I believe there was. It doesn't matter what you believe, counsel. It matters what the record shows and what the district court found. And is your argument now that notwithstanding the district court's factual finding, the agent would not have been able to make a determination that a Ford Explorer located with seven or eight people was riding low? I mean, how much light do you need to be able to make that determination? Well, I don't know. And I would argue as well that there really isn't a whole lot of information. When he says riding low, all he said was riding low, which we've heard time and time again in these cases, in which this court has questioned in the past, as I put in my papers, because it seems to be a rote recitation out of the Border Patrol's handbook. But I guess what I'm arguing is, with regard to lack of evidence, the Border Patrol said it was riding low. It didn't say how much. It didn't say that the bumper was riding on the ground. It didn't say whether it was an inch, two inches. So we really don't know how to weigh that factor very effectively. And as I put in my papers, and as United States v. Arvizo makes clear, you have to weigh some factors more heavily than others. And I just don't think that's one that can be weighed very heavily. And what's different about this case, I think, than some of the other cases that the government cites, Arvizo and Diaz-Juarez, is that there is evidence that would seem to corroborate innocent behavior, just more so than in those cases. I don't think there was ever any factors raised in those cases which would tend to cut towards non-guilty or innocent behavior. And I've laid those out in my brief. Moving along, I'd like to address one of my other arguments, Your Honors, which is that the A-file documents were admitted improperly in this case. And first, as I lay out in my papers from Crawford, the United States Supreme Court overruled its previous precedent, Ohio v. Roberts. In so doing, it overruled this Court's case, Hernandez-Herrera, which had previously said that A-file documents are public records and therefore admissible. Hernandez-Herrera specifically found that the reason there was no Sixth Amendment violation or Confrontation Clause violation was because these documents fell within a firmly rooted hearsay exception. And that's exactly what Crawford v. Washington has now overturned, that line of thinking. So the question is, are these documents testimonial? And I think they clearly are. In Crawford v. Washington, Justice Scalia never gave us a copy. I'm sorry. You say they overruled this explicitly or by implication? I would have to say by implication. By implication. I mean, we don't want to take losses that aren't explicit. And I would point out that this Court's precedent, Miller v. Gammey, which states if Ohio v. I understand that we can conclude it, but I just wouldn't be the first time. Well, the Supreme Court sometimes is aware of a case that's on appeal. So I haven't seen it in that long opinion, so. It certainly didn't cite Hernandez-Herrera. To that extent, it was not. It was a commonly rooted concept, though. Yes. Exactly. And I think moving on, the question then is, are these documents testimonial? That's a good question, isn't it? It is indeed. How do you square your argument? I'm looking at, I think it's page, let me give you a site here, it's Crawford. I guess it's 196 of 158, lawyer's edition, second. I guess that's the best I can give you. But let me read you the language. But there's scant evidence that exceptions were invoked to admit testimonial statements against the accused in a criminal case. Most of the hearsay exceptions covered statements that by their nature were non-testimonial. For example, business records or statements in furtherance of a conspiracy. And I don't read that as saying that they've overruled the business records exception. And isn't that what the records of a prior deportation proceeding are? They're either business or public records of the court? So they're non-testimonial even under Crawford? To be clear, this Court has made a distinction between the public records exception to the hearsay rule and the business records exception. Okay. But either way, it's still, according to this statement in Crawford, it's still considered non-testimonial. No, I would disagree with that. I don't think there's anything in Crawford which would imply that public documents are non-testimonial. I think you need to look at each document that's admitted. You can't just label something, well, it's a business record or it's a public record and say, well, therefore, it must be non-testimonial. But if the key is non-testimonial, how can a document testify? It doesn't make any difference whether it's a public court record or a business record. Pieces of paper don't testify. Well, I think Crawford said otherwise. Yeah. It talks about affidavits and declarations, which are clearly written materials. In fact, in Crawford, it says, it cites one of the old cases which says written materials are of almost no use when it's talking about some of the historical context. And I don't have the name of the Old English or treaties that says that. But I think clearly written materials can be testimony. In this case, I really think you need to look at each of the documents. And I think Justice Scalia does give us a road map to what is testimonial. He says he talks about witnesses, those who bear testimony. And testimony, in turn, is an affirmation made for the purposes of establishing or proving some fact. And that's exactly what these documents would have done to a juror who was reading them. The notice to appear, which is essentially a charging document, like an indictment in a criminal case. And that can be found in Excerpts of Record 45. It says, you are an alien present in the United States. You are not a citizen or national of the United States. You are a native of Mexico, etc., etc. It's really kind of self-serving hearsay. Somebody from this government agency, the INS, we don't know how he came to these conclusions, who he is. He came to these conclusions, and then it's submitted to the jury. And it really is testimonial. I mean, one of the other indications that Justice Scalia gave us of what testimonial is, are things that a reasonable witness might reasonably believe could be used at a later prosecution. And you need only look at the warning to alien, ordered, deported, or removed, where it gives a warning where it says you may be prosecuted under Title VIII United States Code, Section 1326. So the INS was anticipating a future prosecution in this case. It was specifically anticipating criminal litigation. And so I don't think there's any question that these documents are testimonial. Furthermore, I really think that these documents aren't admissible under the rules of evidence. I think, likewise, the court could have excluded them under the rules of evidence. I don't think Would your position be that in all of these cases, the government now, under Crawford, has to call the immigration judge or some witness who was present at the time that the defendant was ordered deported in order to establish the fact of deportation? Well, that's a different question, Your Honor. And I make a difference between documents which are showing the fact of alienage and those which observe a ministerial or an administrative non-adversarial fact, such as the warrant. But the fact that he was previously deported is an element of the illegal reentry crime, is it? Yes, it is. It absolutely is. So I don't see the distinction you're trying to make. Well, I do think that all the documents I've included in the excerpts of record are testimonial for the reasons I've just given. I think what you're asking is a rules of evidence question. Could the observation, the non-adversarial observation of somebody being moved from the country be admitted in the document that's referred to as the warrant of deportation? And under the rules of evidence, I think there's a strong argument that that document could be admitted for that limited purpose. But even the warrant of deportation says you are an alien. It comes to legal conclusions, which really is for the purview of the jury to determine based on the evidence, not in somebody's conclusion that they made years earlier. Okay. I think we're going to have to move on here. Thank you, Your Honor.  I'll give you a couple minutes for rebuttal. Thank you. Good morning, Your Honors. My name is Richard Chang. I was government trial counsel in this case, U.S. v. Cesar Gonzalez-Quintana. Let me go backwards and start at that question or that issue regarding the A-file documents. The charge is muddled, quite frankly, in the moving papers. A-file documents are offered possibly for two reasons. To prove the deportation actually occurred, which is certainly one of the elements that the government has to prove. What they're charging that we did with the A-file documents is indeed not what we did with the A-file documents in this case. They charge that we used it specifically to show what? Alienage. That because there was a finding, a specific finding, or even a specific possibly baseless charge by the immigration judge that you are an alien, we pointed to that fact to prove one of our elements. We did not do that. Despite the fact that there is, I think, ample information and ample holdings within Crawford itself that shows that business records of this sort are non-testimony. In fact, it says that in Crawford itself. It says business records, but I think ultimately, at least my reading of Crawford, is one given the refusal of the court to define testimonial documents and the fact that Chief Justice Rehnquist suggested to endorse public records. I'm not clear where the public records aspect came in. Clearly they refer to, Justice Scalia refers to business records, but the thrust of all that he goes through to get to that point is whether you can use documents that are testimonial in nature, and it doesn't just go to the reliability. It goes to the opportunity to confront, so he's changed the landscape there, and to me that means we have to look at the content of what the business record is. If a business record is regularly kept in the ordinary course of events, so under the old standards that gave it the aura of reliability, I think that approach has been undercut by Crawford. Then the question is what kind of business record is it, particularly if it moves over to official records, which may arguably contain testimonial information. I don't know what the answer is, but all I'm saying is I don't think it's as clear as you're suggesting it is. I'm not saying that it's clear, but there is certainly at least an understanding that these could be, in fact, business records, and that's how the government offered them. More importantly, as it relates to this issue that was brought by the appellant, is how we use these records. That I understand. I take your point. We didn't use these records in the way they say we did. In fact- Did the jury get them with a limitation instruction on it? No, nor was one asked for by the defendant. Let me also indicate, nor was there any argument by the government, even during the time of the introduction of those documents through the custodian of records or by the government at closing, saying that just because you have a document that someone, somewhere, somehow, met this person and the immigration judge found or made an accusation that you're an alien, did we rely on that? And I have to say that if we did that, quite frankly, we would not have done that simply because that's not very compelling information or evidence. What is compelling and what we did refer to time and time again were the defendant's own words about his own alienage, not only at the time of the stop, not only at the time post-Miranda, but also at least on one other occasion when he was what? Convicted of the very same thing. Now, the jury didn't know that he was convicted. Certainly, however, the jury had a transcript of the event, the plea, in which he acknowledged that he was an alien, he was a citizen of Mexico, and he had no right to be in the United States. Then you add the other document that we finally referred the jury to, which was the document or the deportation transcript from the deportation hearing itself, in which not only, and I'll do this very quickly, not only was Mr. Gonzalez-Quintana offered the ability to hire an attorney, which goes into their question about uncounseled deportation, but also, more specifically, are you an alien, sir? And Mr. Gonzalez-Quintana said what? Yes, I am. I'm a citizen of Mexico. And more importantly, I don't have any right to be here, nor did I apply for any right to be here in the United States. All of that was the compelling evidence. The government need not and did not say just because the A document show it, you should rely on that wholly. Let me now move on to, I guess, that first concern about the stop itself. I take it, and I don't want to be presumptuous here, but the government's position is that this is a stop that is not only legal, it is legal because it is based on reasonable suspicion. But even if it's not, even if it's an illegal stop, you can't suppress the body. You cannot suppress, as Judge Coleman knows in, I think, U.S. v. Del Godino, that you cannot suppress the person's identity. But we don't have that situation here. We have an instance in which the district court saw through the lens of its experienced law enforcement officers, supervisory senior agent Roberts, 17 years. Now, Mr. Barker indicates, well, you know, 17 years, about 50 or 60 stops, that's not very much. But that's assuming that all 17 years was at this particular location. That's not the evidence at all. In fact, what the evidence shows, that time and time again, even though distinct if you deconstruct, to use the Court's words in a prior, if you deconstruct what they saw, sure, you can find innocent conduct or innocent explanations for every part of it. But that's not what this Court and that's not what the law says. You look at everything, is what this Court has said, the totality of the circumstances, that key phrase that we've heard almost all morning here. And what is that totality of the circumstances that the district court saw and may find these of? It's Monday morning, she says. You know, she makes a note of that. And it's 5.45 a.m. Monday morning. In a car that is registered out of San Diego. I found that not terribly persuasive. Not necessarily. I commute down in the mornings from Santa Barbara with people coming from Santa Maria County. And to get down here in time at 5.45, I'm on the Pacific Coast Highway. But that really, Your Honor, highlights that certainly there's innocent conduct or innocent explanations for conduct in isolation. Couple that with what else did the agency? It's a notorious location. And I know there's a lot of criticism when agents use, hey, it's a notorious, it's an area notorious for alien smuggling. Or uses the phrase heavily linged. But unfortunately, that's what they see. And that's what they see time and time again. And in this instance, this isn't a situation, as Mr. Barff says, you know, just five or six people that was legitimately held throughout the cabin area of the Ford Explorer. These are seven people in the back huddled together. Causing what? The heavily laden appearance that the agent saw that day. Look at what else is going on here. Judge Tolman indicated that, you know, this is a temporary checkpoint. And Mr. Barff indicated something about the timing of it. Well, the record at the suppression hearing that even the judge noticed was that this agent or both agents knew about that permanent checkpoint. In fact, according to the testimony in the record at the suppression, the permanent checkpoint is about three or four miles east of the temporary checkpoint that they were about to set up. And look at what Agent Roberts, the senior agent or the supervisory agent, said that day. Routinely, when the checkpoint, the non-permanent, or I should say temporary checkpoint, isn't up yet, what does he do? He stations himself in a marked car three or four miles to the east. To look for what? To look for those cars that, holy cow, maybe it's up, maybe it's not, I don't know. But if it is up, what do they do? And what does Agent Roberts say that he sees happen time and time again? They make a quick U-turn. That's why he positions himself as those other agents three miles down the road to the east are setting it up. That's what he saw that day. The government's not saying that he saw a quick U-turn. He saw a heavily-veined vehicle with two people up front and no one in the back. More importantly, at some point, Officer Chapa, who is called by Agent Roberts, says, you know, look out for this vehicle. The primary purpose of that was not to just relay information to build up the probable cause, or I should say the reasonable suspicion for the stop, was be careful. There's a car headed your way, and as you're setting up this checkpoint, be careful about this car not hitting you. So Agent Chapa understands that. He gets into his car. Lo and behold, that black Ford Explorer goes by. And what does he see? He starts making the observations. It's heavily laden. It's bouncing. And it's not just going speedily. It's going really, really, really slow. How much is really, really, really slow? Creeping. Forty-five? That's the problem. That is the problem. Really? We do have cases where, you know, going slow is a factor, but usually they tell you how much. I agree, and we didn't ask that, and it's the government's fault for not having asked that. I don't know. Did you say really, really, really slow, or that's your parallel? No. I'll point it out to the record. Okay. We don't need that. We'll check the record, but I think that's enough. I apologize. There's only two reallys in there. It was going really, really slow, like the driver wasn't really too familiar with the road. That's the third really. Yes. And that's on page 37 of the transfer for the evidentiary hearing on July the 18th, 2003. But there are other factors as well. Besides avoiding that particular checkpoint, you have a stop. Now, Mr. Barsh says, well, you know, it's a stop at a stop sign, and that's absolutely right. But in the training and experience of the agents who saw it, it was a different type of stop than what they would normally see. And what they described in the record, which was, you know, residents that live there either stop quick and they go, right? People who break the law are okay. No, that's not what we're saying. You break the law, that's what we commonly see. They do a virtual stop. They do a California roll. Exactly. But that didn't happen here. That was somewhat indicative. That's something that they noted, along with everything else. Beyond that, again. That's really catch-22. If they'd run the stop, then they would have used it as a protection for the traffic stop. I'll just go off. It's always a catch-22, it seems. Because I've seen records in which they say, it's riding too high. What does that mean? Well, that means in their reports that someone possibly put in the struts or these little wood things to make it higher up so it wouldn't bounce if there was a heavily laden load. Now, that's not this case here, but certainly this goes toward the training and experience of what these agents saw that day. Or are testifying to say. Trying to say. What they testified they saw. You don't have to respond. No, never mind. I'm being a little facetious. It's been a long way. My blood sugar is down. This is very serious. I mean, this is a problem. We get, I mean, I've gone through one of these cases where we had them shining the lights, and the guy gets nailed for putting his hand up by his face, and they say, see, he was avoiding detection. Yeah, because he had a bright headlight shown in his face. Well, they either look at the officer's car or they don't look at it. Either way, they're suspicious. But my hope, again, is that this goes back to the government's argument. Everything has innocent conduct. In fact, everything that Mr. Barff says in his reply brief can have innocent conduct, despite the fact they say that that is, in fact, more indicative of illegal or criminal conduct. Well, that's the problem. If they had already, suppose this had happened an hour later, and they'd already set up a temporary checkpoint, they would have stopped the car at the temporary checkpoint, wouldn't they? Unless they made a decision. Unless they wanted to wave him by. Right. But he would have gotten stopped anyway if there had been a temporary checkpoint. I believe that an hour later they would have been stopped, and I would assume that the driver as well as the passenger would have said the same thing. They were illegal aliens with no right to be in the United States. So eventually, I suppose if it was an hour later, they would have been found. I won't spend too much more time on the other remaining issues in light of Rivera-Silas, but I can certainly answer any questions regarding that. There is no mens rea requirement here. And I want to just echo what this Court's words were. Well, just read Rivera-Silas. What it says is that the indictment sufficiently explains what is necessary. It doesn't hold that mens rea need not be alleged. We understand that. But I think this Court has also said in Rivera-Silas that if, in fact, the alien was involuntarily in the United States, that he was brought in somehow, we would rely on the defense to bring that up affirmatively. And the reason why I bring that up is because there's nothing in the record that says that he was involuntarily brought into the United States. But what is there? There is that argument at the very end, the closing argument, saying that the government didn't prove that. Well, if that's the case, what the jury had the ability to do was look at the circumstances of how this individual was found. He wasn't drugged and gagged and possibly intoxicated, wandering at the border area. This is an individual that was huddled in the fetal position along with six to seven other bodies in the back of a Ford Explorer coming in. There was no doubt what was going on at that point. He was being brought in as an illegal alien. With that, if there's any other questions, I can certainly respond. Okay. Thank you, Your Honor. Yes. Very briefly with regard to the AFILE documents, I guess the chief argument that government counsel made was that because he didn't argue more strenuously that they prove alienage that, you know, it doesn't matter that they were admitted. Well, it might be harmless error, I guess. Well, but please look at the documents themselves. Well, but let's suppose we do. What about the other admissions that were relied on, introduced and established? With regard to harmless error. No, I'm saying, I mean, they had another basis on which to prove it. Didn't they have a direct basis out of his own mouth? They had statements from the defendant, yes. Yeah. Yes. But when somebody makes a determination about harmless error, especially in a situation where there was a violation of the Constitution, this Court's precedent, Gilardi-Gomez, says the government has the obligation, the duty, or the burden, I should say, to prove beyond a reasonable doubt that they still would have gotten a conviction. Well, on alienage, you're saying that the other admissions, his own admissions, wouldn't take care of it? Well, I don't, I can't, I can't answer how a jury would have. Well, we have to make that. Certainly. I mean, we have to make that determination, whether it's, why, tell me why that doesn't meet the beyond a reasonable doubt harmless error standard. Well, to begin, alienage is not the only element. But, obviously, it helped their case, or they wouldn't have admitted, tried to admit these documents and successfully admit them into evidence. Moreover, I mean, this is a case where their arresting agent testified falsely about Mr. Gonzalez's own words. He got up on the stand one day and said one thing. The next day he came back and said, actually. It was somebody else. Yeah. Somebody else said that to me. And the thing about that is, he made the jury believe that Mr. Gonzalez was lying. The next day he admitted that he just didn't remember, it hadn't been Mr. Gonzalez, it was Mr. Romero-Martinez. He also admitted that he put Mr. Romero-Martinez's A-file documents, or that affidavit, I should say, into the wrong A-file, and probably vice versa. So, I mean, certainly the jury may have been more focused on that. Now, I can't stop without mentioning a few other things. I did ask for a limiting instruction. It's absolutely not true that I didn't. In my in-limbs, on several occasions, page 188, 189, 190, I ask under Federal Rule of Evidence 105 that may only consider these. That's okay. Just give us the sites. Yep. One time on 188. Okay. Another time on 189. And there may be others, but I certainly ask for limiting instruction, or in the alternative, a redaction of the offensive alienage statements in these documents. So I did ask for that. Moving on to the suppression of the body, I guess that also is sort of a harmless error argument with regard to what could they suppress. And certainly, they would have suppressed all of the statements at a minimum. And the government, in its brief, and as it just argued, says that they had, you know, they used the statements as the linchpin in their case. They argued that on page 35. They just argued that now. And at a minimum, those would have to have been suppressed. And I would draw your attention to San Juan Cruz, which is a case where this Court suppressed statements in a 1326 case, and despite all the A file documents and all the other evidence, you reversed in that case. And finally, I ask you to look at the cases on Fourth Amendment stops. The ones I cited. Counsel, we have the briefs. Thank you. Thank you. Okay. Fine. Thank counsel for argument. And we will stand. Before we go, we have one issue I want to raise with Mr. Chang. Mr. Chang, what is your explanation for the terrible briefing by the government in this case? Regarding the Justice Department. Yes. Well, regarding the fact that you cut and pasted the brief from another case that didn't have anything to do with the FASCA. I have no good explanation. I should say that I've been in trial I think about 18 times up to this particular year. And during that time, I was in trial as well. But I should highlight that changing or saying that it's one type of model car as opposed to another model car doesn't change the reason nor does it change the case law regarding the stop itself. And, quite frankly, that was the only change that needed to be made, the type as well as the time of this particular event. Well, the only response I think from the court is as a result of your error in not carefully proofreading the brief, Mr. Barth quite properly brought a motion to bring this matter to our attention. It created a huge amount of work for the court at a time when we're trying to prepare for 40 other cases that we're hearing this week. And all I can tell you is be more careful next time and don't let it happen again. Absolutely. And that's one problem. I understand that. But it could have been avoided if you had done a little better job of not making the error in the first place. I agree. If I may just make one quick point. Go ahead. That issue. But the statements were just that we relied on, were just the statements post-Miranda or at the time of the contact. We're talking also about the statements that he made, or I should say admissions, at the time of the deportation regarding age as well as— Let's not re-argue the case. The point is, and I hope you get the point, you were busy, but we're busy too. And you created an extra burden on the court. So don't do it again. I understand. I won't. Okay. Thank you. Don't have to say any more. I mean, we're conveying the message and we just want to make sure you're hearing it. Your Honor, if it had only been the type of car, I never would have filed that motion. That's fine. There's an old rule in litigation. You know, when it's over, close up the books and go. You don't—it doesn't help either one of you to prolong it. We've had our say. We wanted to make sure the message was conveyed. Okay. We stand in adjournment until tomorrow.
judges: Goodwin, Fisher, Tallman